KAREN LeCRAFT HENDERSON, Circuit Judge,
dissenting:
My colleagues conclude that the District’s “good reason” regulation is categorically barred by the Second Amendment. I disagree,[1]
Assuming arguendo that the Second Amendment’s individual right to keep and bear arms extends beyond the home,[2] see Drake v. Filko, 724 F.3d 426, 431 (3d Cir. 2013) (declining “to definitively declare that the individual right to bear arms for the purpose of self-defense extends beyond the home”); Penda v. Cty. of San Diego, 824 F.3d 919, 927 (9th Cir. 2016) (en banc) (same); Woollard v. Gallagher, 712 F.3d 865, 876 (4th Cir. 2013) (same); Kachalsky v. Cty. of Westchester, 701 F.3d 81, 89 (2d Cir. 2012) (same), the proper standard of review “depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right.” Heller v. D.C. (Heller II), 670 F.3d 1244, 1257 (D.C. Cir. 2011) (quoting United States v. Chester, 628 F.3d 673, 682 (4th Cir. 2010)). “Nothing in Heller [/] suggests a case involving a restriction significantly less severe than the total prohibition of handguns at issue there could or should be resolved without reference to one or another of the familiar constitutional standards of scrutiny.” Id. at 1266 (internal quotation marks omitted). Although “a regulation that imposes a substantial burden upon the core right of self-defense protected by the Second Amendment must have a strong justification, ... a regulation that imposes a less substantial burden should be proportionately easier to justify.” Id. at 1257.
The sole Second Amendment “core” right is the right to possess arms for self-defense in the home. Drake, 724 F.3d at 431 (“[T]he individual right to bear arms for the purpose of self-defense [in] the home [is] the ‘core’ of the right as identified by Heller.”); Kachalsky, 701 F.3d at 89 (“Second Amendment guarantees are at their zenith within the home.”); United States v. Masciandaro, 638 F.3d 458, 471 (4th Cir. 2011) (“[A] lesser showing is necessary with respect to laws that burden the right to keep and bear arms outside of the home.”). This conclusion is evidenced, first and foremost, by the United States Supreme Court’s declarations in District of Columbia v. Heller (Heller I) that the *669 “the need for defense of self, family, and property is most acute” in the home, 554 U.S. 570, 628, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) (emphasis added), and in McDonald v. City of Chicago that “the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home,” 561 U.S. 742, 780, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (emphasis added). By characterizing the Second Amendment right as most notable and most acute in the home, the Supreme Court necessarily implied that that right is less notable and less acute outside the home. See Drake, 724 F.3d at 431; Woollard, 712 F.3d at 876; Kachalsky, 701 F.3d at 89; Masciandaro, 638 F.3d at 471. A right that is less notable and less acute cannot reside at the Second Amendment’s core. My colleagues attempt to minimize the Supreme Court’s declarations by insisting that the relevant history speaks with “one voice on the Amendment’s coverage of carrying as well as keeping arms.” Maj. Op. 658-59 (internal quotation marks omitted). But their view of history is with blinders on as it is contradicted by our sister 'circuits’ extensive review of the same historical record.[3] Kachalsky, 701 F.3d at 91 (“History and tradition do not speak with one voice here. What history demonstrates is that states often disagreed as to the scope of the right to bear arms, whether the right was embodied in a state constitution or the Second Amendment.”); Drake, 724 F.3d at 431 (same); Masciandaro, 638 F.3d at 470-71 (“[A]s we move outside the home, firearm rights have always been more limited, because public safety interests often outWeigh individual interests in- self-defense.”); cf. Peruta, 824 F.3d at 939 (in U.S. history, “the Second Amendment right to keep and bear arms does not include, in any degree, the right of a member of the ■ general public to carry concealed firearms in public”). I would join these circuits and find that the “core” Second Amendment right does not extend beyond the home given the history upholding “public carry” regulations, a history “enshrined with[in] the scope of the Second Amendment when it was adopted.” Kachalsky, 701 F.3d at 96 (alteration in original) (“The historical prevalence of the regulation of firearms in public demonstrates that while the Second Amendment’s core concerns are strongest inside hearth and home, states have long recognized a countervailing and competing set of concerns with regard to handgun ownership and use in public.”). Regulations restricting public carrying are all the more compelling in a geographically small -but heavily populated urban area like the District.. See Joseph Blocher, Firearm Localism, 123 Yale L.J. 82, 108 (2013) (“American cities have traditionally had much more stringent gun control than rural areas.”).
Because the District’s good reason regulation does not affect firearm possession within the home and therefore does' -not “impose! ] a substantial burden upon the core right of self-defense protected by the Second Amendment,” I believe the correct standard of review is, at most, intermediate scrutiny, Heller II, 670 F.3d at 1257; accord Woollard, 712 F.3d at 878 (recognizing “longstanding out-of-the-home/in-the-home distinction bearing] directly on *670 the level of scrutiny applicable”); Kachalsky, 701 F.3d at 96 (“Because our tradition so clearly indicates a substantial role for state regulation of the carrying of firearms in public, we conclude that intermediate scrutiny is appropriate in this case.”)- For the District’s challenged licensing regime to pass muster under intermediate scrutiny, it must show that the regime is “substantially related to an important governmental objective.” Heller II, 670 F.3d at 1268 (quoting Clark v. Jeter, 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 466 (1988)). “That is, the District must establish a tight ‘fit’ between the registration requirements and an important or substantial governmental interest, a fit ‘that employs not necessarily the least restrictive means but ... a means narrowly tailored to achieve the desired objective.’” Id. (quoting Bd. of Trs. of State Univ. of N.Y. v. Fox, 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989)). “It essentially imposes a balancing test: the law is constitutional if ‘the governmental interest outweighs the burden [on constitutional rights] and cannot be achieved by means that do not infringe ... rights as significantly.’ ” Heller v. D.C. (Heller III), 801 F.3d 264, 282 (D.C. Cir. 2016) (Henderson, J., concurring in part and dissenting in part) (quoting Minneapolis Star & Tribune Co. v. Minn. Comm’r of Revenue, 460 U.S. 676, 685 n. 7, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983)).
As I have previously written, two additional well-grounded principles should guide the intermediate scrutiny analysis of the District’s good reason regulation. Id. at 282-84. First, “the nature of firearms regulation requires ample deference to the legislature.” Id. at 282. Ample deference stems from the recognition that gun laws involve a “‘complex and dynamic’ issue implicating ‘vast amounts of data’ that the legislature is far better equipped to gather and analyze.” Id. (quoting Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 662-64, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994)); cf. Holder v. Humanitarian Law Project, 561 U.S. 1, 34, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010) (in national security context, “information can be difficult to obtain and the impact of certain conduct difficult to assess”).
Second, the District of Columbia is unique. Heller III, 801 F.3d at 283 (Henderson, J., concurring in part and dissenting in part). It is the seat of our national government, “a city full of high-level government officials, diplomats, monuments, parades, protests and demonstrar tions and, perhaps most pertinent, countless government buildings where citizens are almost universally prohibited from possessing firearms.” Id. Accordingly, our analysis should reflect an appreciation of “the unique challenges that confront the District as it struggles to regulate firearms in our Nation’s capital.” Id. (citing City of L.A. v. Alameda Books, Inc., 535 U.S. 425, 439-40, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002)).
I believe the District’s good reason regulation passes muster under intermediate scrutiny. The District identifies two important government objectives underlying its licensing regime: the prevention of crime and the promotion of public safety. Wrenn Appellee Br. 41. In Heller III, we held, unsurprisingly, that “promoting public safety” is indeed a substantial government interest.[4] Heller III, 801 F.3d at 274. The District has provided evidence that its licensing regime “promotes [that] substantial governmental interest [in a way] that *671 would be achieved less effectively absent the regulation,” and, at the same time, is not “substantially broader than necessary.” Id. at 272 (quoting Heller II, 670 F.3d at 1258). Namely, the District highlights the empirical connection between a profusion of guns and increased violent crime, relying on, inter alia, the studies of leading researchers, including the National Research Council, and of the legislatures of New York, Maryland and New Jersey— all of which have put in place similar licensing regimes. Wrenn Appellee Br. 41-45. Moreover, the District points to the expert testimony of District Police Chief Cathy Lanier as well as commentary from the United States Secret Service and United States Capitol Police explaining the District’s special security concerns that warrant firearms restrictions. Id. at 44. The District’s good reason regulation constitutes its legislature’s analysis of a “complex and dynamic” situation, an analysis that examines “vast amounts of data” and considers the unique needs of the District. Heller III, 801 F.3d at 283 (Henderson, J., concurring in part and dissenting in part). The good reason regulation that emerged deserves “ample deference,” id. at 282, that is, a deference that recognizes
[i]t is the legislature’s job, not ours, to weigh conflicting evidence and make policy judgments. Indeed, assessing the risks and benefits of handgun possession and shaping a licensing scheme to maximize the competing public-policy objectives, as [the District] did, is precisely the type of discretionary judgment that officials in the legislative and executive branches of state government regularly make.
Kachalsky, 701 F.3d at 99. At bottom, firearms regulation “is serious business. We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights.... If ever there was an occasion for restraint, this would seem to be it.” Masciandaro, 638 F.3d at 475-76.
Accordingly, I respectfully dissent.

. I would affirm the denial of preliminary injunctive relief in Wrenn v. District of Columbia, 167 F.Supp.3d 86 (D.D.C. 2016), and reverse the grant of preliminary injunctive relief in Grace v. District of Columbia, 187 F.Supp.3d 124 (D.D.C. 2016).

. Although I assume that the Second Amendment extends to some extent beyond the home, I am certain the core Second Amendment right does not, The application of strict scrutiny—let alone my colleagues' application of a categorical ban—is, in my view, patently off-base.

. The majority acknowledges that other circuits have identified regulations, including bans, regarding the public bearing of arms that were upheld by nineteenth-century "courts. See Kachalsky, 701 F.3d at 94-96; accord Woollard, 712 F.3d at 876 (quoting Masciandaro, 638 F.3d at 470-71). They then discount those decisions as having applied a Second Amendment corollary to the First Amendment’s “ample alternative channels” doctrine. Maj. Op. 662-63. I am not ready to revise history by asserting that nineteenth-century courts used reasoning first articulated a century later. See Benita, 824 F.3d at 942.

. The Supreme Court has also referred to "the significant governmental interest in public safety.” Schenck v. Pro-Choice Network of W.N.Y., 519 U.S. 357, 376, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997).