WM. ENGLISH v. THE STATE.
THE STATE v. G. W. CARTER.
THE STATE v. WM. DANIEL.

1. The Act of April 12, 1871, regulating and in certain cases prohibit-
ing the carrying of pistols, dirks, and certain other deadly weapons,
is not repugnant to the second amendment to the Constitution of the
United States, which provides that "a well regulated militia being
necessary to the security of a free State, the right of the people to
keep and bear arms shall not be infringed ;" nor is the Act in viola-
tion of the thirteenth section of the first article of the Constitution of
this State, which provides that "every person shall have the right
to keep and bear arms in the lawful defense of himself or the State,
under such regulations as the Legislature may prescribe."

2. The "arms" referred to in the second amendment to the United States
Constitution are the arms of a militiaman or soldier, and they do not
comprise dirks, bowie knives, etc., regulated by the Legislature in
the Act of April 12, 1871.

3. The powers of government are intended to operate upon the civil con-
duct of the citizen ; and whatever conduct offends against public
morals or public decency comes within the range of legislative au-
thority.

These causes were appeals from the District Courts
of Marion, Kaufman and Van Zandt counties.

Some reference to the facts of the cases may add
practical significance to the rulings.

In English's case the offensive weapon was a pistol,
and it was proved that he was in a state of intoxication
while wearing it about in the city of Jefferson.  He
proved, in defense, that the pistol was not loaded at
the times it was seen by the witnesses against him ; and
further, that it was out of repair, and he had taken it
along with him to have it mended, as he expected soon
to go to a neighboring county after his mother, and
wished to carry the pistol with him.

The charge against Daniels was going "into a relig-

ious assembly, having about his person a butcher knife." The State's witnesses proved that they saw the defendant in church on the occasion in question, and that the handle of a butcher knife was sticking out above the waistband of his breeches, and between the skirts of his frock coat. They saw nothing but the handle. The court below charged that the handle raised a presumption of a blade.

No transcript in Carter's case has come to the hands of the reporter, nor any brief in his behalf, or in behalf of Daniel.

*R. A. Reeves*, for English.

*William Alexander, Attorney General*, for the State.

WALKER, J.—In each of the above entitled cases the constitutionality of the act of April 12, 1871, regulating, and in certain cases prohibiting, the carrying of deadly weapons, is called in question, and this opinion will dispose of each of the cases. It is insisted that the act referred to is repugnant to the second article of the amendments to the Constitution of the United States.

The article reads as follows: "A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed." Arms of what kind? Certainly such as are useful and proper to an armed militia. The deadly weapons spoken of in the statute are pistols, dirks, daggers, slungshots, sword canes, spears, brass knuckles and bowie knives. Can it be understood that these were contemplated by the framers of our Bill of Rights? Most of them are the wicked devices of modern craft. Mr. Bishop, in his work on Criminal Law, Vol. 2, Par. 124, treats this article of the Constitution in the following manner :

"The Constitution of the United States provides that 'a well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed.' This provision is found among the amendments; and, though most of the amendments are restrictions on the general government alone, not on the States, this one seems to be of a nature to bind both the State and National legislatures, and doubtless it does.

"As to its interpretation, if we look to this question in the light of judicial reason, without the aid of specific authority, we shall be led to the conclusion that the provision protects only the right to 'keep' such 'arms' as are used for purposes of war, in distinction from those which are employed in quarrels and broils, and fights between maddened individuals, since such only are properly known by the name of 'arms,' and such only are adapted to promote 'the security of a free State.' In like manner the right to 'bear' arms refers merely to the military way of using them, not to their use in bravado and affray. Still the Georgia tribunal seems to have held that a statute prohibiting the open wearing of arms upon the person violates this provision of the Constitution, though a statute against the wearing of the arms concealed does not. And, in accord with the latter branch of this Georgia doctrine, the Louisiana court has laid it down that the statute against carrying concealed weapons does not infringe the constitutional right of the people to keep and bear arms; for this statute is a measure of police, prohibiting only a particular mode of bearing arms, found dangerous to the community."

Mr. Bishop goes on to remark that the same provision is found in the constitutions of several of the States, and refers to various authorities—Owen v. The State,

31 Ala., 387, and Cochran v. The State, 24 Texas, 394. We do not think the latter case is aptly cited; the question was not fairly before the court in Cochran v. The State. Mr. Bishop says, "The doctrine as laid down in The State v. Buzzard, 4 Ark., 18, is the doctrine generally approved by the American authorities," and cites Aymette v. The State, 2 Humph., 154; The State v. Reid, 1 Ala., 612; The State v. Mitchell, 3 Blackf., 229; The State v. Newson, 5 Ire., 250. Blackstone says, the offense of riding or going round with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land. And it was an offense prohibited by the statute of Northampton (2 Edward III, C. 3), upon pain of forfeiture of the arms and imprisonment during the King's pleasure. In like manner as by the laws of Solon, every Athenian was fineable who walked about the city in armor. This was also an offense by the early common law of England. (See Knights' case, 3 Mod., 117.)

To refer the deadly devices and instruments called in the statute "deadly weapons," to the proper or necessary arms of a "well regulated militia," is simply ridiculous. No kind of travestry, however subtle or ingenious, could so misconstrue this provision of the Constitution of the United States, as to make it cover and protect that pernicious vice, from which so many murders, assassinations, and deadly assaults have sprung, and which it was doubtless the intention of the Legislature to punish and prohibit. The word "arms" in the connection we find it in the Constitution of the United States, refers to the arms of a militiaman or soldier, and the word is used in its military sense. The arms of the infantry soldier are the musket and bayonet; of cavalry and dragoons, the sabre, holster pistols and carbine; of the artillery, the field piece, siege gun, and mortar, with side arms.

The terms dirks, daggers, slungshots, sword canes, brass knuckles and bowie knives, belong to no military vocabulary. Were a soldier on duty found with any of these things about his person, he would be punished for an offense against discipline.

The act referred to makes all necessary exceptions, and points out the place, the time and the manner in which certain deadly weapons may be carried as means of self-defense, and these exceptional cases, in our judgment, fully cover all the wants of society. There is no abridgment of the personal rights, such as may be regarded as inherent and inalienable to man, nor do we think his political rights are in the least infringed by any part of this law.

It will doubtless work a great improvement in the moral and social condition of men, when every man shall come fully to understand that, in the great social compact under and by which States and communities are bound and held together, each individual has compromised the right to avenge his own wrongs, and must look to the State for redress. We must not go back to that state of barbarism in which each claims the right to administer the law in his own case; that law being simply the domination of the strong and the violent over the weak and submissive.

It is useless to talk about personal liberty being infringed by laws such as that under consideration. The world has seen too much licentiousness cloaked under the name of natural or personal liberty; natural and personal liberty are exchanged, under the social compact of States, for civil liberty.

The powers of government are intended to operate upon the civil conduct of the citizen; and whenever his conduct becomes such as to offend against public morals or public decency, it comes within the range of

legislative authority. How far the functions of police may be extended to govern the conduct of men—how far personal liberty may be restrained for the prevention of crime, are nice questions; yet, says one of the ablest thinkers of modern times, John Stuart Mill, in his work on "Liberty," pages 56 and 57, "It is one of the undisputed functions of government, to take precautions against crime before it has been committed, as well as to detect and punish it afterwards. The right inherent in society, to ward off crimes against itself by antecedent precautions, suggests the obvious limitations to the maxim, 'that purely self-regarding misconduct cannot properly be meddled with in the way of prevention or punishment.'"

It is furthermore claimed that this is a law in violation of the thirteenth section, first article, of our own Constitution, which reads thus: "Every person shall have the right to keep and bear arms in the lawful defense of himself or the State, under such regulations as the Legislature may prescribe."

We understand the word "arms," when used in this connection, as having the same import and meaning which it has when used in the amendment to the Federal Constitution.

Our Constitution, however, confers upon the Legislature the power to regulate the privilege. The Legislature may regulate it without taking it away;—this has been done in the act under consideration. But we do not intend to be understood as admitting for one moment, that the abuses prohibited are in any way protected either under the State or Federal Constitution. We confess it appears to us little short of ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly, as, for instance,

into a church, a lecture room, a ball room, or any other place where ladies and gentlemen are congregated together.

It is not our purpose to make an argument in justification of the law. The history of our whole country but too well justifies the enactment of such laws. This law is not peculiar to our own State, nor is the necessity which justified the enactment (whatever may be said of us to the contrary) peculiar to Texas. It is safe to say that almost, if not every one of the States of this Union have a similar law upon their statute books, and, indeed, so far as we have been able to examine them, they are more rigorous than the act under consideration. Other older States have been better able to carry out these laws than we have yet been, and the laws perhaps themselves have been less repugnant to the people of those States, than our law has been to a class of our own people. But a law is not to be set aside because it may be repugnant to the wishes, or distasteful to a class of the community, for it is generally to that class that the law is more especially addressed. Were such a rule to obtain in civilized States, it would operate a revocation of all legislative functions; the mob would assume to declare what should be law, and what should not. There could be no reformation of evils in society. Communities and States would degenerate just in proportion as their laws were wise and wholesome, or foolish and immoral. The law under consideration has been attacked upon the ground that it was contrary to public policy, and deprived the people of the necessary means of self-defense; that it was an innovation upon the customs and habits of the people, to which they would not peaceably submit. We do not think the people of Texas are so bad as this, and we do think that the latter half of the nine-

teenth century is not too soon for Christian and civilized States to legislate against any and every species of crime. Every system of public laws should be, in itself, the purest and best system of public morality. We will not say to what extent the early customs and habits of the people of this State should be respected and accommodated, where they may come in conflict with the ideas of intelligent and well-meaning legislators. A portion of our system of laws, as well as our public morality, is derived from a people the most peculiar perhaps of any other in the history and derivation of its own system. Spain, at different periods of the world, was dominated over by the Carthagenians, the Romans, the Vandals, the Snevi, the Allani, the Visigoths, and Arabs; and to this day there are found in the Spanish codes traces of the laws and customs of each of these nations blended together into a system by no means to be compared with the sound philosophy and pure morality of the common law.

Nations, in their transitions from one form of government to another, are full as apt to retain what is bad in the old, as to adopt what is good in a new system. The object and purpose of all law should be the promotion and advancement of the happiness and well being of the people upon whom the law is to operate.

We are far from believing that the ultimate results of the law under consideration will not be beneficial to the people of the State. But however much we might desire to sustain the law on the grounds of public policy and expediency, such is not our reason for sustaining it. We sustain it because it is the law of the land, and in our judgment in conflict with no higher law. In the case of the State v. Carter, No. 639, the judgment of the district court is reversed and the cause remanded; in English v. The State, No. 590, the judg-

ment of the district court is affirmed; and in Daniels v. The State, the same entry.

ORDERED ACCORDINGLY.