Concurrence by Judge GRABER;
Dissent by Judge CALLAHAN;
Dissent by Judge SILVERMAN;
Dissent by Judge N.R. SMITH
*924 OPINION
W. FLETCHER, Circuit Judge:
Under California law, a member of the general public may not carry a concealed weapon in public unless, he or she has been issued a license. An applicant for a license must satisfy a number of conditions. Among other things, the applicant must show “good cause” to carry a concealed firearm. California law authorizes county sheriffs to establish and publish policies defining good cause. The sheriffs of San Diego and Yolo Counties published policies defining good cause as requiring a particularized reason why an applicant needs a concealed firearm for self-defense.
Appellants, who live in San Diego and Yolo Counties, allege that they wish to carry concealed firearms in public for self-defense, but that they do not satisfy the good cause requirements in their counties. They contend that their counties’ definitions of good cause violate their Second Amendment right to keep and bear arms. They particularly rely on the Supreme Court’s decisions in District of Columbia v. Heller, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), and McDonald v. City of Chicago, 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010).
We hold that the Second Amendment does not preserve or protect a right of a member of the general public to carry concealed firearms in public.
I. Procedural History
Plaintiff Edward Peruta lives in San Diego County. He applied for a license to carry a concealed firearm in February 2009, but his application was denied because he had not shown good cause under the policy published in his county. Plaintiff Adam Richards lives in Yolo County. He sought a license to carry a concealed firearm in May 2009, but was told he eo.uld not establish good cause under his county’s policy. Peruta, Richards, and the other plaintiffs — five residents of San Diego and Yolo Counties, as well as several gun-rights organizations — brought two separate suits challenging under the Second Amendment the two counties’ interpretation and application of the statutory good cause requirement under California law.
The district courts granted summary judgment in each case, holding that the counties’ policies do not violate the Second Amendment. Peruta v. Cty. of San Diego, 758 F.Supp.2d 1106 (S.D. Cal. 2010); Richards v. Cty. of Yolo, 821 F.Supp.2d 1169 (E.D. Cal. 2011). A divided three-judge panel of this court reversed both decisions. The panel majority held in a published opinion in Peruta that San Diego’s policy violated the Second Amendment. See Peruta v. Cty. of San Diego, 742 F.3d 1144 (9th Cir. 2014); see also id., at 1179 (Thomas, J., dissenting). Although Plaintiffs challenged only the county’s concealed firearms policy, the panel held that their challenge should not be “viewed in isolation.” Rather, in the view of the panel majority, Plaintiffs’ suit should be viewed as a challenge to “the constitutionality of [California’s] entire [statutory] scheme.” Id. at 1171. In the majority’s view, the Second Amendment required that “the states permit some form of carry for self-defense outside the home.” Id. at 1172 (emphasis in original). Because California’s statutory scheme permits concealed carry only upon a showing of good cause and because open carry is also restricted, the panel held that the county’s definition of good cause for a concealed carry license violates the Second Amendment. Id. at 1179. The panel held in Richards that, in light of its holding in Peruta, the Yolo County policy also violated the Second Amendment. See Richards v. Prieto, 560 Fed.Appx. 681 (9th Cir. 2014); see also id. *925 at 682 (Thomas, J., concurring in the judgment).
Yolo County and its sheriff, Ed Prieto, filed a petition for rehearing en banc in Richards. San Diego County’s sheriff, William Gore, announced that he would not petition for rehearing en banc in Peruta. After Sheriff Gore declined to file a petition, the State of California moved to intervene in Penda in order to seek rehearing en banc. The same divided three-judge panel denied California’s motion to intervene. See Peruta v. Cty. of San Diego, 771 F.3d 570 (9th Cir. 2014); see also id. at 576 (Thomas, J., dissenting).
We granted rehearing en banc in both cases. Peruta v. Cty. of San Diego, 781 F.3d 1106 (9th Cir. 2015); Richards v. Prieto, 782 F.3d 417 (9th Cir. 2015).
II. Standard of Review
We review a district court’s grant of summary judgment de novo. Sanchez v. Cty. of San Diego, 464 F.3d 916, 920 (9th Cir. 2006). We review constitutional questions de novo. Am. Acad. of Pain Mgmt. v. Joseph, 353 F.3d 1099, 1103 (9th Cir. 2004).
III. California Firearms Regulation
California has a multifaceted statutory scheme regulating firearms. State law generally prohibits carrying concealed firearms in public, whether loaded or unloaded. Cal. Penal Code § 25400. State law also generally prohibits carrying loaded firearms on the person or in a vehicle in any public place or on any public street, in either an incorporated city or a “prohibited area” of “unincorporated territory.” Id. § 25850. Finally, state law generally prohibits carrying unloaded handguns openly on the person in a public place or on a public street, in either an incorporated city or a “prohibited area” of an “unincorporated area of a county.” Id. § 26350.
However, there are numerous exceptions to these general prohibitions. For example, the prohibitions of §§ 25400 and 25850 do not apply to active and retired “peace officers.” Id. §§ 25450, 25900. The prohibition of § 25400 does not apply to guards or messengers of common carriers of banks or financial institutions while employed in the shipping of things of value. Id. § 25630. The prohibition of § 25850 does not apply to armored vehicle guards, guards or messengers of common carriers, banks or financial institutions, security guards, animal control officers, or zookeepers, provided they have completed an approved course in firearms training. Id. §§ 26015, 26025, 26030.
Further, the prohibition of § 25400 does not apply to licensed hunters or fishermen while engaged in hunting or fishing, to members of target shooting clubs while on target ranges, or to the transportation of unloaded firearms while going to or returning from hunting or fishing expeditions or target ranges. Id. §§ 25640, 25635. Nor does it apply to the transportation of a firearm to and from a safety or hunting class or a recognized sporting event involving a firearm, to transportation between a person’s residence and business or private property owned or possessed by the person, or to transportation between a business or private residence for the purpose of lawful repair, sale, loan, or transfer of the firearm. Id. §§ 25520, 25525, 25530. The prohibition of § 25850 does not apply to a person having a loaded firearm at his or her residence, including a temporary residence or campsite. Id. § 26055. Nor does it apply to a person having a loaded firearm at his or her place of business or on his or her private property. Id. § 26035. It also does not apply to a person “who reasonably believes that any person or the property of any person is in immediate, grave danger and that the carrying of the *926 weapon is necessary for the preservation of that person or property.” Id. § 26045. Nor does it apply to persons using target ranges for practice, or to members of shooting clubs while hunting on the premises of the clubs. Id. § 26005. Finally, the prohibitions of §§ 25400, 25850 and 23650 do not apply'to transportation of firearms between authorized locations, provided that the firearm is unloaded and in a locked container, and that the course of travel has no unreasonable deviations. Id. § 25505.
The case before us concerns the general prohibition of § 25400 against carrying loaded or unloaded concealed weapons, and a license-based exception to that prohibition. The prohibition of § 25400 does not apply to those who have been issued licenses to carry concealed weapons. Id. § 25655. The sheriff of a county may issue a concealed carry license to a person upon proof of all of the following:
(1) The applicant is of good moral character.
(2) Good causé exists for issuance of the license.
(3) The applicant is a resident of the county or a city within the county, or the applicant’s principal place of employment or business is in the county or a city within the county and the applicant spends a substantial period of time in that place of employment or business.
(4) The applicant has completed a course of training as described in Section 26165.
Id. § 26150(a). The chief of a municipal police department may issue a concealed carry license under comparable criteria; the only difference is that the applicant must be a “resident of that city.” Id. §§ 26155(a), 26155(a)(3) (residence). Sheriffs and municipal police chiefs are required to “publish and make available a written policy summarizing the provisions” of §§ 26150(a) and 26155(a). Id. § 26160.
An affidavit of Blanca Pelowitz, Manager of the San Diego Sheriffs Department License Division, describes the definition of good cause in San Diego County:
Good Cause ... is defined by this County to’be a set of circumstances that distinguish the applicant from the mainstream and causes him or her to be placed in harm’s way. Simply fearing for one’s personal safety alone is not considered good cause. This criterion can be applied .to situations related to personal protection as well as those related to individual businesses or occupations.
Good cause is also evaluated on an individual basis. Reasons applicants request a license will fall into one of ... four general categories!!]
The only two general categories potentially relevant to this appeal are:
Category 2 = Personal Protection Only includes: documented threats, restraining orders and other related situations .where an applicant can demonstrate they are a specific target at risk.
Category 4 = Business owners/employees includes a diversity of businesses & occupations, such as doctors, attorneys, CEO’s, managers, employees and volunteers whose occupation or business places them at high risk of harm.
The published policy of Yolo County does not define “good cause” but gives examples of where good cause does, or does not, exist. The policy provides as follows:
Examples of valid reasons to request a permit include, but are not limited to:
Victims of violent crime and/or documented threats of violence.
Business owners who carry large sums of cash or valuable items.
*927 Business owners who work all hours in remote areas and are likely to encounter dangerous people and situations.
Examples o[f] invalid reasons to request a permit include, but are not limited to:
Recreation in remote areas.
Hunting or fishing.
Self protection and protection of family (without credible threats of violence).
Employment in the security field, i.e., security guard, body guard, VIP protection.
Personal safety due to job conditions or duties placed on the applicant by their employer.
IV. Second Amendment and Concealed Carry
Plaintiffs contend that the good cause requirement for concealed carry, as interpreted in the policies of the sheriffs of San Diego and Yolo Counties, violates the Second Amendment. Plaintiffs’ arguments in the two cases differ in some particulars, but they essentially proceed as follows. First, they contend that the Second Amendment guarantees at least some ability of a member of the general public to carry firearms in public. Second, they contend that California’s restrictions on concealed and open carry of firearms, taken together, violate the Amendment. Third, they contend that there would be sufficient opportunity for public carry of firearms to satisfy the Amendment if the good cause requirement for concealed carry, as interpreted by the sheriffs of San Diego and Yolo Counties, were eliminated. Therefore, they contend, the counties’ good cause requirements for concealed carry violate the Amendment. While Plaintiffs base their argument on the entirety of California’s statutory scheme, they allege only that they have sought permits to carry concealed weapons, and they seek relief only against the policies requiring good cause for such permits. Notably, Plaintiffs do not contend that there is a free-standing Second Amendment right to carry concealed firearms.
We do not reach the question whether the Second Amendment protects some ability to carry firearms in public, such as open carry. That question was left open by the Supreme Court in Heller, and we have no need to answer it here. Because Plaintiffs challenge only policies governing concealed carry, we reach only the question whether the Second Amendment protects, in any degree, the ability to carry concealed firearms in public. Based on the overwhelming consensus of historical sources, we conclude that the protection of the Second Amendment — whatever the scope of that protection may be — simply does not extend to the carrying of concealed firearms in public by members of the general public.
The Second Amendment may or may not protect, to some degree, a right of a member of the general public to carry firearms in public. But the existence vel non of such a right, and the scope of such a right, are separate from and independent of the question presented here. We hold only that there is no Second Amendment right for members of the general public to carry concealed firearms in public.
A. Heller and McDonald
The Second Amendment provides: “A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.” U.S. Const, amend. II. The watershed case interpreting the Amendment is District of Columbia v. Heller, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). The plaintiff in Heller *928 challenged a District of Columbia statute that entirely banned the possession of handguns in the home, and required that any lawful firearm in the home be “disassembled or bound by a trigger lock-at all times, rendering it inoperable.” Id. at 628, 128 S.Ct. 2783.
Relying on the phrase “shall not be infringed,” the Court in Heller viewed the Amendment as having “codified a pre-ex-isting right.” Id. at 592, 128 S.Ct. 2783 (emphasis in original). The Court focused on the history leading to the adoption of the Amendment, and on the common understanding of the Amendment in. the years following its adoption. The Court concluded that the “pre-existing right” to keep and bear arms preserved by the Second Amendment was in part an individual right to personal self-defense, not confined to the purpose of maintaining a well-regulated militia. The Court struck down the challenged statute, concluding that the Amendment preserves the right of members of the general public to keep and bear arms in their homes for the purpose of self-defense: “[W]e hold that the District’s ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense.” Id. at 635,128 S.Ct. 2783.
The Court in Heller was careful to limit the scope of its holding. Of particular interest here, the Court noted that the Second Amendment has not been generally understood to protect the right to carry concealed firearms. The Court wrote:
Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. For example, the majority of the 19th-century courts to consider the question held that prohibitions on ca'irying concealed weapons were lawful under the Second Amendment or state analogues. See, e.g., State v. Chandler, 5 La.Ann. at 489-90 [ (1850) ]; Nunn v. State, 1 Ga. at 251 [ (1846) ]; see generally 2 Kent, [Commentaries on American Law (0. Holmes ed., 12th ed. 1873)] *340, n.2; The American Students’ Blackstone 84, n.ll (G. Chase ed. 1884).
Id. at 626-27, 128 S.Ct. 2783 (emphasis added) (some citations omitted).
At the end of its opinion, the Court again emphasized the limited scope of its holding, and underscored the tools that remained available to the District of Columbia to regulate firearms. Referring the reader back to the passage just quoted, the Court wrote:
The Constitution leaves the District of Columbia a variety of tools for combating th[e] problem [of handgun violence], including some measures regulating handguns, see supra at 626-627, and n. 26,128 S.Ct. 2783.
Id. at 636,128 S.Ct. 2783.
Heller left open the question whether the Second Amendment applies to regulation of firearms by states and localities. The Court answered the question two years later, in McDonald v. City of Chicago, 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010), holding that the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment. In substantial part, the Court based its holding on the understanding of a “clear majority” of the states when the Fourteenth Amendment was adopted. The Court wrote:
A clear majority of the States in 1868 '... recognized the right to keep and bear arms as being among the founda *929 tional rights necessary to our system of Government.
In sum, it is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty.
Id. at 777-78,180 S.Ct. 3020.
B. Second Amendment Right to Keep and Bear Concealed Arms
In analyzing the meaning of the Second Amendment, the Supreme Court in Heller and McDonald treated its historical analysis as determinative. The Court in Heller held that the Second Amendment, as originally adopted, “codified a pre-existing right,” 554 U.S. at 592, 128 S.Ct. 2783 (emphasis omitted), a “right inherited from our English ancestors,” id. at 599, 128 S.Ct. 2783 (internal quotation marks omitted). The Court in McDonald held, further, that this “pre-existing right” was incorporated into the Fourteenth Amendment, based in substantial part on the importance attached to the right by a “clear majority” of the states. In determining whether the Second Amendment protects the right to carry a concealed weapon in public, we engage in the same historical inquiry as Heller and McDonald. As will be seen, the history relevant to both the Second Amendment and its incorporation by the Fourteenth Amendment lead to the same conclusion: The right of a member of the general public to carry a concealed firearm in public is not, and never has been, protected by the Second Amendment.
1. History Relevant to the Second Amendment
a. Right to Bear Arms in England
The right to bear arms in England has long been subject to substantial regulation. In 1299, Edward I directed the sheriffs of Safford and Shalop to prohibit anyone from “going armed within the realm without the king’s special licence.” 4 Calendar Of The Close Rolls, Edward I, 1296-1302, at 318 (Sept. 15, 1299, Canterbury) (H.C. Maxwell-Lyte ed., 1906). Five years later, in 1304, Edward I ordered the sheriff of Leicester to enforce his prohibition on “any knight, esquire or other person from ... going armed in any way without the king’s licence.” 5 Calendar Of The Close Rolls, Edward I, 1302-1307, at 210 (June 10, 1304, Stirling) (H.C. Maxwell-Lyte ed., 1908).
In 1308, Edward II ordered the town of Dover to ensure that “no knight, esquire, or other shall ... go armed at Croydon or elsewhere before the king’s coronation.” 1 Calendar Of The Close Rolls, Edward II, 1307-1313, at 52 (Feb. 9, 1308, Dover) (H.C. Maxwell-Lyte ed., 1892). In 1310, he issued a similar order to the sheriff of York, demanding that the sheriff prohibit any “earl, baron, knight, or other” from going armed. Id. at 257 (Mar. 20, 1310, Berwick-on-Tweed). Two years later, in 1312, Edward II ordered the sheriffs in Warwick and Leicester to seize the weapons of any that “go armed” without special permission from the king. Id. at 553 (Oct. 12, 1312, Windsor). These early prohibitions, targeting particular towns and counties, and particular actors, foreshadowed a more general proclamation nearly two decades later, in which Edward II prohibited “throughout [the King’s] realm” “any one going armed without [the King’s] licence.” 4 Calendar Of The Close Rolls, Edward II, 1323-1327, at 560 (Apr. 28, 1326, Kenil-worth) (H.C. Maxwell-Lyte ed., 1892).
In 1328, under Edward III, Parliament enacted the Statute of Northampton, an expanded version of Edward II’s earlier prohibition. The Statute provided that
*930 no Man great nor small, of what Condition soever he be, except the King’s Servants in his presence, and his Ministers in executing of the King’s Precepts, or of their Office, and such as be in their Company assisting them ... be so hardy to come before the King’s Justices, or other of the King’s Ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere, upon pain to forfeit their Armour to the King, and their Bodies to Prison at the King’s pleasure.
2Edw. 3, c. 3 (1328). The Statute of Northampton would become the foundation for firearms regulation in England for the next several centuries. See Patrick J. Charles, The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review, 60 Clev. St. L. Rev. 1, 7-36 (2012) (describing the Statute of Northampton, as well as English firearms regulation before and after the adoption of the statute).
The Statute of Northampton was widely enforced. In 1388, for example, Richard II issued to the bailiffs of Scardburgh an
[o]rder to arrest and imprison until further order for their deliverance all those who shall be found going armed within the town, leading an armed power, making unlawful assemblies, or doing aught else whereby the peace may be broken and the people put in fear ... as in the statute lately published at Northampton among other things it is contained that no man of whatsoever estate or condition shall be bold to appear armed before justices or king’s ministers in performance of their office, lead an armed force in breach of the peace, ride or go armed by day or night in fairs and markets or elsewhere in presence of justices etc. ...
3 Calendar Of The Close Rolls, Richard II, 1385-1389, at 399^00 (May 16, 1388, Westminster) (H.C. Maxwell-Lyte ed., 1914). A half-century later, Henry VI issued a similar order, reminding his subjects of the
statute published in the parliament hol-den at Norhampton [sic] in 2 Edward III, wherein it is contained that no man of whatsoever estate or condition shall go armed, lead an armed power in breach of the peace, or ride or pass armed by day or night in fairs, markets or elsewhere in the presence of the justices, the-king’s ministers or others under pain of losing his arms and of imprisonment at the king’s will....
4 Calendar Of The Close Rolls, Henry VI, 1441-1447, at 224 (May 12, 1444, Westminster) (A.E. Stamp ed., 1937).
John Carpenter’s The White Book of the City of London published in 1419- — England’s first common law treatise — documented the continuing authority of the Statute of Northampton. With narrow exceptions, Carpenter wrote, the law mandated that “no one, of whatever condition he be, go armed in the said city or in the suburbs, or carry arms, by day or by night.” Liber Albus: The White Book Of The City Of London 335 (Henry Thomas Riley ed., 1861).
In 1541, under the second Tudor king, Henry VIII, Parliament enacted a statute to stop “shamefull murthers roberies felo-nyes ryotts and routs.” 33 Hen. 8, c. 6, § 1 (1541-1542) (Eng.). The statute limited gun ownership to the wealthy — those who “have lands tents rents fees annuityes or Offices, to the yearley value of one hundred Pounds.” 33 Hen. 8, c. 6, § 2 (1541-1542) (Eng.). Of particular importance to the case now before us, the statute expressly forbade everyone, including the *931 wealthy, from owning or carrying concealable (not merely concealed) weapons, such as “little shorte handguns and little hag-butts,” and guns “not of the lengthe of one whole Yarde or hagbutt or demyhake be-inge not of the lenghe of thre quarters of a Yarde.” Id.-, see Lois G. Schwoerer, To Hold and Bear Arms: The English Perspective, 76 Chi.-Kent L. Rev. 27, 35-37 (2000-2001) (discussing the 1541 statute of Henry VIII and related laws).
A half-century later, Elizabeth I continued her father’s prohibition against concealed weapons. She issued a proclamation in 1594 emphasizing that the Statute of Northampton prohibited not just the “open carrying” of weapons, but also the carrying of “a device to have secretly small Dagges, commonly called pocket Dags.” By The Quenne Elizabeth I: A Proclamation Against the Carriage of Dags, and for Reformation of Some Other Great Disorders (London, Christopher Barker, 1594). Six years later, she ordered “all Justices of the Peace” to enforce the Statute “according to the true intent and meaning of the same,” which meant a prohibition on the “car[r]ying and use of Gunnes ... and especially of Pistols, Birding pieces, and other short pieces and small shot” that could be easily concealed. By The Quenne Elizabeth I: A Proclamation Prohibiting The Use And Cariage Of Dagges, Birding Pieces, And Other Gunnes, Contrary To Law 1 (London, Christopher Barker 1600).
The first Stuart king, James I, issued a proclamation in 1613, forbidding concealed weapons and reciting that the “bearing of Weapons covertly ... hath ever beene ... straitly forbidden”:
Whereas the bearing of Weapons covertly, and specially of short Dagges, and Pistols, (truly termed of their use, pocket Dagges, that are apparently made to be carried close, and secret) hath ever beene, and yet is by the Lawes and policie of this Realme straitly forbidden as carying with it inevitable danger in the hands of desperate persons....
By The King James I: A Proclamation Against The Use Of Pocket-Dags 1 (London, Robert Barker, 1613) (emphases added). Three years later, James I issued another proclamation similar to Elizabeth I’s, banning the sale, wearing, and carrying of “Steelets, pocket Daggers, pocket Dags and Pistols, which are weapons utterly unserviceable for defence, Militarie practise, or other lawfull use, but odious, and. noted Instruments of murther, and mischiefe.” By The King James I: A Proclamation Against Steelets, Pocket Daggers, Pocket Dagges and Pistols, reprinted in 1 Stuart Royal Proclamations 359-60 (James F. Larkin & Paul L. Hughes eds., 1973).
In the late 1600s, in Sir John Knight’s Case, England’s Attorney General charged John Knight with violating the Statute of Northampton by “walking] about the streets armed with guns.” 87 Eng. Rep. 75 (K.B. 1686). After clarifying that “the meaning of [the Statute of Northampton] was to punish people who go armed to terrify the King’s subjects,” id., the Chief Justice acquitted Knight, but only because, as a government official, he was exempt from the statute’s prohibition.
In 1694, Lord Coke described the Statute of Northampton as providing that a man may neither “goe nor ride armed by night nor by day ... in any place whatsoever.” The Third Part of the Institutes of the Laws of England 160, ch. 73 (London, R. Brooke, 1797). Coke recounted the case of Sir Thomas Figett, who was arrested when he “went armed under his garments” before a justice of the King’s bench. Id. at 161-62. William Hawkins wrote in 1716 that, under the Statute of Northampton, “a Man cannot excuse the wearing [of] such Armour in Publick, by alledging that such *932 a one threatened him, and that he wears it for the Safety of his Person from his Assault.” 1 William Hawkins, A Treatise Of The Pleas Of The Crown 489, ch. 28, § 8 (London, J. Curwood, 8th ed. 1824). Blackstone, writing in the 1760s, compared the Statute of Northampton to “the laws of Solon, [under which] every Athenian was finable who walked about the city in arm-our.” 5 William Blackstone, Commentaries on the Laws of England, edited by St. George Tucker, 149 § 9 (Phila. 1803).
James II, the last of the Stuart kings and England’s last Catholic monarch, sought to disarm his Protestant subjects. James II was driven from the throne in 1688 in the Glorious Revolution. In 1689, under his Protestant successors, William of Orange (William III) and Mary II, Parliament enacted the English Bill of Rights, which, as the Court in Heller recognized, has “long been understood to be the predecessor to our Second Amendment.” Heller, 554 U.S. at 593, 128 S.Ct. 2783. The Bill of Rights provided, with respect to the right to bear arms, “[t]hat the subjects which are Protestants may have arms for their defence suitable to their conditions and as allowed by law.” 1 W. & M., c. 2, § 7, in 3 Eng. Stat. at Large 441 (1689) (emphasis added).
To the degree that the English Bill of Rights is an interpretive guide to our Second Amendment, the critical question is the meaning of the phrase “ás allowed by law.” More narrowly, with respect to the case now before us, the specific question is whether the arms that are “allowed by law” — that is, the arms Protestants had the right to bear — included concealed firearms. The history just recounted demonstrates that carrying concealed firearms in public was not “allowed by law.” Not only was it generally prohibited by the Statute of Northampton, but it was specifically forbidden by the statute enacted under Henry VIII, and by the later proclamations of Elizabeth I and James I.
The English writer, Granville Sharp, addressed this precise point in 1782. Sharp is a particularly important source, given that the Court in Heller cited his treatise as an authority supporting its understanding of the English Bill of Rights. See Heller, 554 U.S. at 594, 128 S.Ct. 2783. According to Sharp, the phrase “as allowed by law” referred to pre-existing restrictions, including the statute passed under Henry VIII prohibiting concealed arms. Sharp wrote:
[The] latter expression, “as allowed by law,” respects the limitations in the above-mentioned act of 33 Hen. VIII c. 6, which restrain the use of some particular sort of arms, meaning only such arms as were liable to be concealed, or otherwise favour the designs of murderers, as “cross-bows, little short handguns, and little hagbuts,” and all guns UNDER CERTAIN LENGTHS, specified in the act....
Tracts, Concerning the Ancient and Only True Legal Means of National Defence, by a Free Militia 17-18 (3d ed. 1782) (emphasis in original).
Thus, by the end of the eighteenth century, when our Second Amendment was adopted, English law had for centuries consistently prohibited carrying concealed (and occasionally the even broader category of concealable) arms in public. The prohibition may be traced back generally to the Statute of Northampton in 1328, and specifically to the Act of Parliament under Henry VIII in 1541. The prohibition was continued in the English Bill of Rights, adopted in 1689, and was clearly explained by Granville Sharp in 1782, less than a decade before the adoption of the Second Amendment.
*933 b. Right to Bear Arms in Colonial America
We have found nothing in the historical record suggesting that the law in the American colonies with respect to concealed weapons differed significantly from the law in England. In 1686, the New Jersey legislature, concerned about the “great abuses” suffered by “several people in the Province” from persons carrying weapons in public, passed a statute providing that “no person or persons ... shall presume privately to wear any pocket pistol, skeins, stilladers, daggers or dirks, or other unusual or unlawful weapons within this Province.” An Act Against Wearing Sivords, &c., N.J. Laws Chap. IX (1689). Other colonies adopted verbatim, or almost verbatim, English law. For example, in 1692, the colony and province of Massachusetts Bay authorized the Justice of the Peace to arrest those who “shall ride or go armed Offensively before any of Their Majesties Justices ... or elsewhere, by Night or by Day, in Fear or Affray of Their Majesties Liege People.” An Act for the Punishing of Criminal Offenders, Mass. Laws Chap. XI § 6 (1692).
c. Right to Bear Arms in the States
The Supreme Court in Heller discussed state court decisions after the adoption of the Second Amendment on the ground that they showed how the Amendment— and the right to bear arms generally — was commonly understood in the years following its adoption. We recognize that these decisions are helpful in providing an understanding of what the adopters of the Second Amendment intended, but we postpone our discussion to the next section, for they are even more helpful in providing an understanding what the adopters of the Fourteenth Amendment intended.
2. History Relevant to the Fourteenth Amendment
a. Pre-amendment History
Following the lead of the Supreme Court in both Heller and McDonald, we look to decisions of state courts to determine the scope of the right to keep and bear arms as that right was understood by the adopters of the Fourteenth Amendment. With only one exception — and a short-lived exception at that — state courts before the Civil War unanimously concluded that members of the general public could be prohibited from carrying concealed weapons.
In State v. Mitchell, 3 Blackf. 229, 1833 WL 2617 (Ind. 1833), the Supreme Court of Indiana, in a one-sentence opinion, upheld a state statute prohibiting the general public from carrying concealed weapons: “It was held in this case, that the statute of 1831, prohibiting all persons, except travelers, from wearing or carrying concealed weapons, is not unconstitutional.” Id. at 229 (emphasis in original).
In State v. Reid, 1 Ala. 612 (1840), the defendant had been convicted of violating a statute prohibiting any person from “carrying] concealed about his person, any species of fire arms, or any Bowie knife, Arkansaw tooth pick, or any other knife of the like kind, dirk, or any other deadly weapon.” Id. at 614. The Supreme Court of Alabama upheld the statute against a challenge under the state constitution. It based its analysis in substantial part on its conclusion that the English Bill of Rights did not protect a right to carry concealed weapons. The court wrote:
The evil which was intended to be remedied [by the English Bill of Rights] was a denial of the right of Protestants to have arms for their defence, and not an inhibition to wear them secretly.
*934 Id. at 615 (emphasis added). The court defended the Alabama statute on practical as well as legal grounds:
[A] law which is intended merely to promote personal security, and to put down lawless aggression and violence, and to that end inhibits the wearing of certain weapons, in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others, does not come in collision with the constitution.
Id. at 617.
In Aymette v. State, 21 Tenn. 154 (1840), a jury convicted the defendant of wearing a bowie knife concealed under his clothes. The defendant contended that the conviction violated a Tennessee constitutional provision stating that “free white men of this State have a right to keep and bear arms for their common defence.” Id. at 156. The Tennessee Supreme Court interpreted the English Bill of Rights, as well as the Tennessee constitution, as protecting a group right to engage in military action rather than an individual right to self-defense:
When, therefore, Parliament says that “subjects which are Protestants may have arms for their defence, suitable to their condition, as allowed by law,” it does not mean for private defence, but, being armed, they may as a body rise up to defend their just rights, and compel their rulers to respect the laws.
Id. at 157. In the view of the court, concealable weapons did not come within the scope of either the English Bill of Rights or the state constitution:
The Legislature, therefore, have a right to prohibit the wearing or keeping [of] weapons dangerous to the peace and safety of the citizens, and which are not usual in civilized warfare, or would not contribute to the common defence.
Id. at 159.
In State v. Buzzard, 4 Ark. 18, 19 (1842), the trial court quashed an indictment alleging violation of a state statute providing that “every person who shall wear any pistol, dirk, butcher or large knife, or a sword in a cane, concealed as a weapon, unless upon a journey, shall be adjudged guilty of a misdemeanor.” The Arkansas Supreme Court reversed. Even though the Fourteenth Amendment had not yet been adopted, the court believed that the statute was properly challenged under both the Second Amendment and the state constitution. The court held that the statute violated neither the federal nor the state constitution. In upholding the statute, Justice Dickinson wrote that the purpose of the two constitutional provisions was to provide “adequate means for the preservation and defense of the State and her republican institutions.” Id. at 27.
The act in question does not, in my judgment, detract anything from the power of the people to defend their free state and the established institutions of the country. It inhibits only the wearing of certain arms concealed.

Id.

In Nunn v. State, 1 Ga. 243 (1846), the defendant was charged with carrying a pistol, but the indictment did not specify that he carried it “secretly.” An 1837 state statute criminalized carrying concealed weapons, but allowed open carry. Like the Arkansas Supreme Court in Buzzard, the Georgia Supreme Court addressed the statute under both the Second Amendment and the state constitution. The court discussed extensively the right to bear arms, writing that the Second Amendment
assigns as a reason why this right [to keep and bear arms] shall not be interfered with, or in any manner abridged, *935 that the free enjoyment of it will prepare and qualify a well-regulated militia, which are necessary to the security of a free State.
Id. at 250 (emphasis in original). The court concluded that insofar as it prohibited the carrying of concealed weapons, the statute was constitutional:
We are of the opinion ... that so far as the act of 1837 seeks to suppress the practice of carrying certain weapons secretly, that it is valid, inasmuch as it does not deprive the citizen of his natural right of self-defense, or of his constitutional right to keep and bear arms.
Id. at 251 (emphasis in original). However, because the indictment failed to allege that the defendant had carried his pistol in a concealed manner, the court dismissed it. See Saul Cornell, The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities, 39 Fordham Urb. L.J. 1695, 1716-26 (2011-2012) (discussing Nunn and the emergence of public carry regulation outside the south).
In State v. Chandler, 5 La.Ann. 489 (1850), the defendant argued that the trial judge should have instructed the jury that it was not a crime in Louisiana to carry a concealed weapon because the Second Amendment guaranteed to citizens the right to bear arms. The Louisiana Supreme Court rejected the argument, holding that a law prohibiting concealed weapons did not violate the Amendment:
The [Louisiana statute] makes it a misdemeanor to be “found with a concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or any other place about him, that does not appear in full open view.” This law became absolutely necessary to counteract a vicious state of society, growing out of the habit of carrying concealed weapons, and to prevent bloodshed and assassinations committed upon unsuspecting persons. It interfered with no man’s right to carry arms ... “in full open view,” which places men upon an equality. This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations.
Id. at 489-90.
The only exception to this otherwise uniform line of cases is Bliss v. Commonwealth, 12 Ky. 90 (1822), in which the Kentucky Court of Appeals, by a vote of two to one, struck down a state statute prohibiting the wearing of “a pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon.” Id. at 90. The court held that the statute violated Article 10, § 23 of Kentucky’s constitution, which provided that “the right of the citizens to bear arms in defense of themselves and the state, shall not be questioned.” Id. The court wrote:
[I]n principle, there is no difference between a law prohibiting the wearing concealed arms, and a law forbidding the wearing such as are exposed; and if the former be unconstitutional, the latter must be so likewise.
Id. at 92.
The court’s decision in Bliss was soon attacked, and was overruled over a decade before the Civil War. In 1837, Governor James Clark, deeply concerned about the “bloodshed and violence” caused by concealed weapons in the wake of Bliss, called on the Kentucky legislature to pass a new statute banning the practice. The Kentucky legislative committee that received the Governor’s message criticized the court for reading the state constitution too *936 literally. See Robert M. Ireland, The Problem of Concealed Weapons in Nineteenth-Century Kentucky, 91 Reg. Ky. Hist. Soc’y 370, 373 (1993). In 1849, a Kentucky constitutional convention adopted without debate a provision authorizing the legislature to “pass laws to prevent persons from carrying concealed arms.” Ky. Const, art. XIII, § 25. Then, in 1854, the Kentucky legislature passed a new statute prohibiting the concealed carry of “any deadly weapons other than an ordinary pocket knife.” An Act to prohibit the carrying of concealed weapons, Mar. 10, 1853, Ky. Acts, Chap. 1020 (1854).
The Supreme Court stated in Heller that “the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues.” 554 U.S. at 626, 128 S.Ct. 2783 (emphasis added). The Court substantially understated the matter. As just noted, with the exception of Bliss, those pre-Civil War state courts that considered the question all upheld prohibitions against concealed weapons. Four of the six courts upholding prohibitions specifically discussed, and disagreed with, Bliss. See Reid, 1 Ala. at 617-20; Aymette, 21 Tenn. at 160-61; Buzzard, 4 Ark. at 25-26; Nunn, 1 Ga. at 247-48. Moreover, the two-to-one Bliss decision did not last. Bliss was decided in 1822; a state constitutional amendment was adopted in 1849 to overturn Bliss; the legislature then passed a statute in 1854 outlawing concealed weapons.
The Supreme Court wrote in McDonald that a “clear majority of the States in 1868 ... recognized the right to keep and bear arms as being among the foundational rights necessary to our system of Government.” 561 U.S. at 777, 130 S.Ct. 3020 (emphasis added). Based in substantial part on its understanding of the “clear majority” of states, the Court held that the adopters of the Fourteenth Amendment intended to incorporate the right to bear arms preserved by the Second Amendment. As just seen, an overwhelming majority of the states to address the question — indeed, after 1849, all of the states to do so — understood the right to bear arms, under both the Second Amendment and their state constitutions, as not including a right to carry concealed weapons in public.
b. Post-Amendment History
The Supreme Court in Heller discussed the decisions of early 19th century courts after the adoption of the Second Amendment, on the ground that they were relevant to understanding the intent of the eighteenth century adopters of the Amendment. 554 U.S. at 605-14, 128 S.Ct. 2783. We follow the Court’s lead with respect to the Fourteenth Amendment and discuss decisions after its adoption.
The pre-Civil War consensus about the meaning of the right to keep and bear arms continued after the war and the adoption of the Fourteenth Amendment. The post-war constitutions of five states explicitly stated that the right to carry concealed weapons could be prohibited by the legislature. N.C. Const, of 1868, art. I, § 24 (1875) (“A well-regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed; ... Nothing herein contained shall justify the practice of carrying concealed weapons, or prevent the Legislature from enacting penal statutes against said practice.”); Colo. Const, art. II, § 13 (1876) (“The right of no person to keep and bear arms in defense of his home, person and property, or in aid of the civil power when thereto legally summoned, shall be called in question; but nothing herein contained shall be *937 construed to justify the practice of carrying concealed weapons.”); La. Const, of 1879, art. Ill (“A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be abridged. This shall not prevent the passage of laws to punish those who carry weapons concealed.”); Mont. Const, of 1889, art. II, § 12 (“The right of any person to keep or bear arms in defense of his own home, person, and property, or in aid of the civil power when thereto legally summoned, shall not be called in question, but nothing herein contained shall be held to permit the carrying of concealed weapons.”); Miss. Const, art. Ill, § 12 (1890) (“The right of every citizen to keep and bear arms in defense of his home, person, or property, or in aid of the civil power when thereto legally summoned, shall not be called in question, but the legislature may regulate or forbid carrying concealed weapons”). See generally David B. Kopel, The Second Amendment in the Nineteenth Century, 1998 BYU L. Rev. 1359,1410 n. 190 (1998).
The post-war constitutions of another six states, while not explicitly granting to the legislatures the authority to prohibit concealed weapons, gave state legislatures broad power to regulate the manner in which arms could be carried. See Ga. Const, of 1868, art. I, § 14 (“A well-regulated militia being necessary to the security of a free people, the right of the people to keep and bear arms shall not be infringed; but the general assembly shall have power to prescribe by law the manner in which arms may be borne.”); Tex. Const, of 1868; art. I, § 13 (“Every person shall have the right to keep and bear arms in the lawful defence of himself or the State, under such regulations as the legislature may prescribe.”); Tenn. Const, art. I, § 26 (1870) (“That the citizens of this State have a right to keep and to bear arms for their common defense; but the Legislature shall have power, by law, to regulate the wearing of arms with a view to prevent crime.”); Fla. Const, of 1885, art. I, § 20 (“The right of the people to bear arms in defence of themselves and the lawful authority of the State, shall not be infringed, but the Legislature may prescribe the manner in which they may be borne.”); Idaho Const, of 1889, art. I, § 11 (“The people have the right to' bear arms for their security and defense; but the Legislature shall regulate the exercise of this right by law.”); Utah Const, of 1896, art. I, § 6 (“The people have the right to bear arms for their security and defense, but the legislature may regulate the exercise of this right by law.”). See generally Eugene Volokh, State Constitutional Rights to Keep and Bear Arms, 11 Tex. Rev. of L. & Pol. 191, 192-217 (2006) (collecting state constitutional provisions). In these states, the legislatures of Georgia and Tennessee had already passed statutes prohibiting concealed weapons, and the supreme courts of those states, in Nunn and Ay-mette, had already upheld the statutes against constitutional challenges. Aymette, 21 Tenn. 154; Nunn, 1 Ga. 243. As will be seen in a moment, the Texas legislature would soon pass a statute prohibiting concealed weapons, and that statute, too, would be upheld.
Two state courts and one territorial court upheld prohibitions against carrying concealable (not just concealed) weapons in the years following the adoption of the Fourteenth Amendment. In English v. State, 35 Tex. 473 (1871), a Texas statute “regulating, and in certain cases prohibiting, the carrying of deadly weapons,” including “pistols, dirks, daggers, slungshots, swordcanes, spears, brass-knuckles and bowie knives,” id. at 474, was challenged under the Second Amendment, as well as under an analogous provision of the Texas constitution. The Texas Supreme Court *938 upheld the statute. The court construed “arms” in the Second Amendment and the Texas constitution as referring only to weapons “used for purposes of war.” Id. at 475. The court wrote:
To refer the deadly devices and instruments called in the statute “deadly weapons,” to the proper or necessary arms of a “well-regulated militia,” is simply ridiculous. No kind of travesty, however subtle or ingenious, could so misconstrue this provision of the constitution of the United States, as to make it cover and protect that pernicious vice, from which so many murders, assassinations, and deadly assaults have sprung, and which it was doubtless the intention of the legislature to punish and prohibit.
Id. at 476.
In State v. Workman, 35 W.Va. 367, 14 S.E. 9, 11 (1891), a West Virginia statute prohibited carrying, whether openly or concealed, “any revolver or other pistol, dirk, bowie-knife, razor, slung-shot, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character.” The statute exempted from the prohibition a person who is “a quiet and peaceable citizen, of good character and standing in the community in which he lives,” and who had “good cause to believe, and did believe, that he was in danger of death or great bodily harm at the hands of another person.” Id. at 9. Defendant was convicted under the statute because he failed to prove that he was of good character, despite the fact that he had been in clear and immediate danger of death from a particular individual. Id. at 10. Defendant contended that the statute violated the Second Amendment. Id. at 11. The West Virginia Supreme Court upheld the statute on the ground that the Amendment protected only the right to carry weapons of war:
[I]n regard to the kind of arms referred to in the amendment, it must be held to refer to the weapons of warfare to be used by the militia, such as swords, guns, rifles, and muskets, — arms to be used in defending the state and civil liberty, — and not to pistols, bowie-knife, brass knuckles, billies, and such other weapons as are usually employed in brawls, street fights, duels, and affrays, and are only habitually carried by bullies, blackguards, and desperadoes, to the terror of the community and the injury of the state.

Id.

In Walburn v. Territory, 9 Okla. 23, 59 P. 972 (1899), the defendant was convicted of “carrying a revolver on his person.” The Supreme Court of the Territory of Oklahoma sustained the law under which the defendant had been convicted. “[W]e are of the opinion that the statute violates none of the inhibitions of the constitution of the United States, and that its provisions are within the police power of the territory.” Id. at 973.
Finally, and perhaps most importantly, in Robertson v. Baldwin, 165 U.S. 275, 17 S.Ct. 326, 41 L.Ed. 715 (1897), the United States Supreme Court made clear that it, too, understood the Second Amendment as not protecting the right to carry a concealed weapon. The Court wrote:
[T]he first 10 amendments to the constitution, commonly known as the “Bill of Rights,” were not intended to lay down any novel principles of government, but simply to embody certain guaranties and immunities which we had inherited from our English ancestors, and which had, from time immemorial, been subject to certain well-recognized exceptions, arising from the necessities of the case. In incorporating these principles into the fundamental law, there was no intention of disregarding the exceptions, which *939 continued to be recognized as if they had ■ been formally expressed. Thus ... the right of the people to keep and bear arms (article 2) is not infringed by laws prohibiting the carrying of concealed weapons[.]
Id. at 281-82,17 S.Ct. 326.
3. No Second Amendment Right to Carry Concealed Weapons
The historical materials bearing 'on the adoption of the Second and Fourteenth Amendments are remarkably consistent. Under English law, the carrying of concealed weapons was specifically prohibited since at least 1541. The acknowledged predecessor to the Second Amendment, the 1689 English Bill of Rights, protected the rights of Protestants to have arms, but only those arms that were “allowed by law.” Concealed weapons were not “allowed by law,” but were, instead, flatly prohibited. In the years after the adoption of the Second Amendment and before the adoption of the Fourteenth Amendment, the state courts that considered the question nearly universally concluded that laws forbidding concealed weapons were consistent with both the Second Amendment and their state constitutions. The only exception was Kentucky, whose court of appeals held to the contrary in a two-to-one decision based on its state constitution. Kentucky thereafter amended its constitution to overturn that result. In the decades immediately after the adoption of the Fourteenth Amendment, all of the state courts that addressed the question upheld the ability of their state legislatures to prohibit concealed weapons. Finally, the United States Supreme Court unambiguously stated in 1897 that the protection of the Second Amendment does not extend to “the carrying of concealed weapons.” Baldwin, 165 U.S. at 282, 17 S.Ct. 326.
We therefore conclude that the Second Amendment right to keep and bear arms does not include, in any degree, the right of a member of the general public to carry concealed firearms in public. In so holding, we join several of our sister circuits that have upheld the authority of states to prohibit entirely or to limit substantially the carrying of concealed or concealable firearms. See Peterson v. Martinez, 707 F.3d 1197 (10th Cir. 2013) (right to carry concealed weapons does not fall within the Second Amendment’s scope); Woollard v. Gallagher, 712 F.3d 865 (4th Cir. 2013) (Maryland requirement that handgun permits be issued only to individuals with “good and substantial reason” to wear, carry, or transport a handgun does not violate Second Amendment); Drake v. Filko, 724 F.3d 426, 429-30 (3d Cir. 2013) (New Jersey “justifiable need” restriction on carrying handguns in public “does not burden conduct within the scope of the Second Amendment’s guarantee”); Kachalsky v. Cty. of Westchester, 701 F.3d 81 (2d Cir. 2012) (New York “proper cause” restriction on concealed carry does not violate Second Amendment).
Our holding that the Second Amendment does not protect the right of a member of the general public to carry concealed firearms in public fully answers the question before us. Because the Second Amendment does not protect in any degree the right to carry concealed firearms in public, any prohibition or restriction a state may choose to impose on concealed carry — including a requirement of “good cause,” however defined — is necessarily allowed by the Amendment. There may or may not be a Second Amendment right for a member of the general public to carry a firearm openly in public. The Supreme Court has not answered that question, and we do not answer it here.
*940 V. Intervention by the State of California
The State of California moved to intervene in Peruta after Sheriff Gore of San Diego County declined to petition for rehearing en banc. Plaintiffs did not oppose intervention by the State. As recounted at the beginning of this opinion, however, a divided panel denied the State’s motion. We disagree and grant the motion.
Under Federal Rule of Civil Procedure 24(a)(2), a party may intervene as of right if
(1) it has a significant protectable interest relating to the subject of the action;
(2) the disposition of the action may, as a practical matter, impair or impede its ability to protect its interest; (3) the application is timely; and (4) the existing parties may not adequately represent its interest.
Day v. Apoliona, 505 F.3d 963, 965 (9th Cir. 2007) (citation, internal quotation marks, and alterations omitted); see also Fed. R. Civ. P. 24(a)(2).
There is no question that California has a significant interest in Peruta (and, indeed, in Richards). As the panel majority noted, Plaintiffs “focuse[d] [their] challenge on [the counties’] licensing scheme for concealed carry.” Peruta, 742 F.3d at 1171. But the panel majority construed the challenge as an attack on “the constitutionality of [California’s] entire [statutory] scheme.” Id. at 1171; see also id. at 1169 (assessing whether “the California scheme deprives any individual of his constitutional rights” (emphasis added)). While Plaintiffs’ original challenge to the county policies did not appear to implicate the entirety of California’s statutory scheme, the panel opinion unmistakably did.
The panel opinion in Peruta, if left intact, would have substantially impaired California’s ability to regulate firearms. A key premise of the opinion was that the Second Amendment requires the states to “permit some form of carry for self-defense outside the home.” Id. at 1172 (emphasis in original). Though California’s statutory scheme permits many residents, in many contexts, to carry a firearm outside the home, it does not permit law-abiding residents of sound mind to do so without a particularized interest in self-defense.
Under the circumstances presented here, we conclude that California’s motion to intervene was timely. To determine whether a motion to intervene is timely, we consider “(1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and length of the delay.” United States v. Alisal Water Corp., 370 F.3d 915, 921 (9th Cir. 2004) (internal quotation marks omitted). We recognize that California sought to intervene at a relatively late stage in the proceeding. But the timing of California’s motion to intervene did not prejudice Plaintiffs; indeed, Plaintiffs did not, and do not, oppose the State’s intervention. Equally important, California had no strong incentive to seek intervention in Peruta at an earlier stage, for it had little reason to anticipate either the breadth of the panel’s holding or the decision of Sheriff Gore not to seek panel rehearing or rehearing en banc.
Our conclusion that California’s motion to intervene was timely is consistent with our decision in Apoliona, in which the State of Hawai’i had made an argument, as amicus curiae before the district court, that the defendants had chosen not to make. 505 F.3d at 964. The district court agreed with Hawai’i’s argument, but we reversed, holding that the argument was foreclosed by circuit precedent. Id. Hawai’i *941 moved to intervene as a party in order to file a petition for rehearing en banc. Id. Notwithstanding the fact that “the state was aware of the litigation and that the litigation had the potential to affect its interests,” we granted the motion. Id. at 966. Permitting Hawai’i to intervene, we wrote, “will not create delay by injecting new issues into the litigation, but instead will ensure that our determination of an already existing issue is not insulated from review simply due to the posture of the parties.” Id. at 965 (citation, internal quotation marks, and alterations omitted).
If we do not permit California to intervene as a party in Penda, there is no party in that case that can fully represent its interests. At trial and on appeal, attorneys representing Sheriff Gore ably defended San Diego County’s interpretation of the good cause requirement. But after the panel decision was issued, Sheriff Gore informed the court that he would neither petition for rehearing en banc nor defend the county’s position in en banc proceedings. California then appropriately sought to intervene in order to fill the void created by the late and unexpected departure of Sheriff Gore from the litigation.
VI. Response to Dissents
Our colleagues Judges Callahan, Silver-man and N.R. Smith have each written dissenting opinions. We consider Judge Callahan’s opinion to be the principal dissent because its argument provides an essential premise for the other two.
None of the dissents contends that there is a free-standing Second Amendment right for a member of the general public to carry a concealed weapon in public. Nor do they make any effort to contradict or undermine any of the historical evidence showing that the carrying of concealed weapons was consistently forbidden in England beginning in 1541; was consistently forbidden in the American colonies; and was consistently forbidden by the states (with the sole and short-lived exception of Kentucky) both before and after the Civil War. Nor do they dispute that the United States Supreme Court in 1897 clearly stated that carrying concealed weapons was not protected by the Second Amendment. Robertson v. Baldwin, 165 U.S. 275, 281-82, 17 S.Ct. 326, 41 L.Ed. 715 (1897) (“[T]he right of the people to keep and bear arms (article 2) is not infringed by laws prohibiting the carrying of concealed weapons[.]”).
The argument of the principal dissent begins with the premise that Plaintiffs, as members of the general public, have a Second Amendment right to carry firearms in public as a means of self-defense. Principal Diss. at 948-49. The principal dissent characterizes California’s restrictions on open carry as effectively prohibiting open carry. It concludes that when California’s restrictions on open and concealed carry are considered together, they violate the Second Amendment: “In the context of California’s choice to prohibit open carry, the counties’ policies regarding the licensing of concealed carry are tantamount to complete bans on the Second Amendment right to bear arms outside the home for self-defense, and are therefore unconstitutional.” Id. at 950. Therefore, according to the principal dissent, California’s restrictions on concealed carry violate the Second Amendment. Judge N.R. Smith’s dissent agrees with this argument, emphasizing the “context” of Plaintiffs’ challenge to California’s restrictions on concealed carry.
The argument of the principal dissent is based on a logical fallacy. Even construing the Second Amendment as protecting the right of a member of the general public to carry a firearm in public (an issue we do not decide), and even assuming that Cali- *942 forma’s restrictions on public open carry violate the Second Amendment so construed (an issue we also do not decide), it does not follow that California’s restrictions on public concealed carry violate the Amendment.
As the uncontradicted historical evidence overwhelmingly shows, the Second Amendment does not protect, in any degree, the right of a member of the general public to carry a concealed weapon in public. The Second Amendment may or may not protect to some degree a right of a member of the general public to carry a firearm in public. If there is such a right, it is only a right to carry a firearm openly. But Plaintiffs do not challenge California’s restrictions on open carry; they challenge only restrictions on concealed carry.
If there is a Second Amendment right of a member of the general public to carry a firearm openly in public, and if that right is violated, the cure is to apply the Second Amendment to protect that right. The cure is not to apply the Second Amendment to protect a right that does not exist under the Amendment.
VII. Agreement with the Concurrence
Our colleague Judge Graber concurs fully in our opinion, but writes separately “to state that, even if we assume that the Second Amendment applied to the carrying of concealed weapons in public, the provisions at issue would be constitutional.” Graber, J., concurrence at 942. Even if we assume that the Second Amendment applies, California’s regulation of the carrying of concealed weapons in public survives intermediate scrutiny because it “promotes a substantial government interest that would be achieved less effectively absent the regulation.” Id. at 945 (internal quotation marks omitted). For the reasons given in our opinion, we do not need to reach the question addressed by the concurrence. But if we were to reach that question, we would entirely agree with the answer the concurrence provides.
Conclusion
We hold that the Second Amendment does not protect, in any degree, the carrying of concealed firearms by members of the general public. This holding resolves the Second Amendment question presented in this case. It also necessarily resolves, adversely to Plaintiffs, their derivative claims of prior restraint, equal protection, privileges and immunities, and due process. In light of our holding, we need not, and do not, answer the question of whether or to what degree the Second Amendment might or might not protect a right of a member of the general public to carry firearms openly in public.
We AFFIRM the judgments of the district courts in both cases.