Filed 10/23/20  P. v. Malott CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C082691 |
| Plaintiff and Respondent, | (Super. Ct. No. 14F01069) |
| v. | |
| RICHARD ANDREW MALOTT, | |
| Defendant and Appellant. | |

Under California law, a person generally may not carry a concealed weapon in public.  One exception to this rule is for those who are licensed to carry concealed weapons.  A jury convicted defendant Richard Andrew Malott of violating this law by carrying a concealed firearm in a vehicle (Pen. Code, § 25400, subd. (a)(1))[1] and carrying a firearm on his person in public (§ 25850, subd. (a)).  Although defendant argued he had

---

[1]    Undesignated statutory references are to the Penal Code.

a license authorizing him to carry the firearm, the jury declined to find this license exempted him from the charges.

On appeal, defendant contends California's licensing scheme for concealed firearms is unconstitutional in two respects: first, he claims it is too vague and violates the Fourteenth Amendment's due process clause; and second, he argues it unconstitutionally burdens his Second Amendment right to bear arms. He also contends the trial court committed several errors in its jury instructions and its evidentiary rulings.

We reject defendant's constitutional challenges to California's concealed weapons laws and his objections to the lower court's evidentiary rulings. We also find the alleged errors in the jury instructions, assuming there were any, were harmless beyond a reasonable doubt. We affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In April of 2013, Sacramento County Sheriff's Sergeant Darron Epperson pulled over defendant after seeing him run a stop sign. Epperson asked defendant to step out of the car and after he did, Epperson asked whether defendant was carrying any weapons. Defendant responded he was not. Epperson then patted down defendant and noticed a rigid object in defendant's front right pant pocket. When asked about the object, defendant first claimed it was his keys; but after Epperson said he thought otherwise, defendant said he did not know what was in his pocket. Epperson then reached into defendant's pocket and found a loaded handgun—namely, a .22-caliber Derringer handgun.

Based on these facts, defendant was charged with carrying a concealed firearm in a vehicle (§ 25400, subd. (a)(1)) and carrying a firearm on his person in public (§ 25850, subd. (a)). He was also charged with two enhancements. He was charged with an enhancement on the first offense, carrying a concealed firearm in a vehicle, because the firearm was loaded, and defendant was not listed as the gun's registered owner with the Department of Justice. He was also charged with a similar enhancement for the second

2

offense, carrying a firearm on his person in public, because he was not listed as the gun's registered owner with the Department of Justice. These alleged enhancements raised the charges, which would otherwise be misdemeanors, to felonies. (See §§ 25400, subd. (c)(6), 25850, subd. (c)(6).)

At trial, much of the testimony concerned whether defendant had a license that authorized him to carry the Derringer handgun.

Defendant argued both charges against him failed because he had a license from Nevada County that authorized him to carry a concealed firearm.

The prosecution countered that defendant's license did not cover the Derringer handgun, and in any event, the license was suspended at the time of his arrest. To support this argument, the prosecution relied principally on the testimony of a witness from the Nevada County Sheriff's Office, Candy Poulter. As Poulter testified, defendant's license mentioned only that he was authorized to carry a .380-caliber Beretta handgun and a .45-caliber Sig handgun. The license did not reference the Derringer handgun that defendant carried when arrested. Poulter also testified about two documents showing that defendant's license was suspended at the time of his arrest. One was a July 6, 2012 letter that the Nevada County Sheriff's Office had sent to defendant, which stated that defendant's license had been suspended and asked that he mail his license back to the sheriff's office. The other was a license report from the sheriff's office that included various notes about defendant's license. These notes, among other things, stated that defendant's license was renewed in May of 2012, that the sheriff's office sent defendant a letter on July 6, 2012, advising him that his license had been suspended and that on July 9, 2012, the sheriff's office received defendant's license.

After the close of evidence, the trial court instructed the jury that it was a defense to the charges if defendant had a license to carry the particular firearm. Defendant's counsel had asked for an instruction on the license defense and argued the prosecution should carry the burden to show that defendant did not have a license. The court,

3

however, found nothing in the CALCRIM instructions discussing a license defense. Believing the CALCRIM instructions might have mistakenly omitted a discussion of this defense, the court next looked to the older CALJIC instructions—specifically, CALJIC No. 12.46.2. According to that instruction, "[i]t is a defense that the defendant had a license to carry the particular firearm. To establish this defense, the burden is on the defendant to raise a reasonable doubt that he was acting lawfully." Satisfied with this language, the court inserted it into the standard CALCRIM instructions.

The jury convicted defendant on both counts. It hung on the charged enhancements, however, and the prosecution ultimately dismissed the enhancements. Because the enhancements were dropped, both charges were reduced to misdemeanors. At sentencing, the trial court suspended imposition of judgment, placed defendant on formal probation for three years, and ordered him to serve 90 days in jail.

Defendant timely filed this appeal.

DISCUSSION

I

*California's Concealed Weapons Laws and the Vagueness Doctrine*

Defendant raises two constitutional challenges to California's licensing scheme for concealed firearms. First, he argues this licensing scheme is unconstitutionally vague because it fails to adequately notify licensees that they are limited to carrying only those firearms specifically referenced in their license. We disagree.

The void-for-vagueness doctrine, "which derives from the due process concept of fair warning, bars the government from enforcing a provision that 'forbids or requires the doing of an act in terms so vague' that people of 'common intelligence must necessarily guess at its meaning and differ as to its application.' [Citations.]" (*People v. Hall* (2017) 2 Cal.5th 494, 500.) To succeed on a vagueness claim, a litigant must show "the law is vague as to [him or] her or 'impermissibly vague in *all of its applications*.' [Citations.]" (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1116.)

4

Applying the doctrine here, we find California's statutory scheme governing concealed firearms is sufficiently clear about what is prohibited. Section 25400, subdivision (a)(1) makes it unlawful for a person to carry a concealed firearm "within any vehicle that is under the person's control or direction." Section 25850, subdivision (a) in turn, prohibits a person from carrying a loaded firearm "on the person or in a vehicle while in any public place or on any public street." Both statutes reasonably inform the public about the generally prohibited conduct. Both statutes also include numerous exceptions to their prohibitions. Relevant here, section 25655 and 26010 provide an exception to section 25400 and 25850, respectively, for those licensed to carry concealed weapons under section 26150 et seq. Section 26150 et seq., finally, provides the framework governing licenses to carry concealed weapons, and it includes several statutes that make clear that a license only covers those firearms specifically referenced in the license. Section 26175, subdivision (i) for example, provides that any license "shall. . . contain a description of the weapon or weapons authorized to be carried, giving the name of the manufacturer, the serial number, and the caliber." Section 26215, subdivision (a) adds that a "person issued a license pursuant to this article may apply to the licensing authority for an amendment to the license to . . . . [¶] (1) Add or delete authority to carry a *particular* pistol, revolver, or other firearm capable of being concealed upon the person." (Italics added.)

Defendant acknowledges that both section 26175 and section 26215 refer to the designation of particular firearms in a license, but, he argues, an ordinary person would still conclude that a license allowing the carrying of certain specified firearms would also allow the carrying of other concealable firearms.

We disagree. Section 26175, subdivision (i) is express that a license *shall* describe the weapons authorized to be carried, and it must do so with particularity by describing the weapon, the name of the manufacturer, the serial number, and the caliber. So, for example, if a licensee were authorized to carry a certain type of Derringer handgun under

5

his license, the license would need to describe that handgun in specific detail. And if the license did not describe the Derringer handgun, then it follows the license did not authorize the carrying of that particular weapon. Section 26215, subdivision (a) further emphasizes the particularized nature of licenses, providing that a licensee may add or delete a "*particular*" firearm to his or her license—a requirement that only makes sense if licenses cover only those *particular* firearms listed in the license. Considering these provisions, we find people of common intelligence would not have to guess to understand that concealed carry licenses only cover those firearms specifically mentioned. Defendant's vagueness challenge, accordingly, fails.

II

*Jury Instructions*

Defendant also raises several arguments relating to the jury instructions. First, he contends the trial court erred in placing the burden on him to show he had a license to carry a concealed weapon. According to defendant, the court should have instructed that the prosecution had the burden to show he did not have a license. Second, because the question of whether his license was suspended was placed in issue, defendant argues the court erred in failing to instruct that the prosecution had the burden of showing defendant knew his license was suspended.

We acknowledge, at the start, that courts have historically placed on defendants the burden of showing they had a license to carry a concealed weapon. In *People v. Ross* (1922) 60 Cal.App. 163, for example, the court found the prosecution had no duty "to show that no license had been issued to appellant." (*Id.* at p. 166.) The court reasoned that "[i]f a license has been issued that fact is more immediately within the knowledge of the defendant and can be easily established by him; and there is no hardship or injustice in placing so slight a burden upon him." (*Id.* at p. 167.) Later courts have found likewise. (See *People v. Superior Court* (1969) 2 Cal.App.3d 197, 202, fn. 7 ["the burden of proof is upon the carrier of such a weapon to show his license to carry it"];

6

*People v. Williams* (1960) 184 Cal.App.2d 673, 675 ["The burden was on defendant to show that he had a license to carry the pistol."].)

We need not decide, however, whether this precedent defeats defendant's arguments here; to the extent the court erred in its instructions, the error was harmless. And that is true whether the alleged error is reviewed under the standard stated in *People v. Watson* (1956) 46 Cal.2d 818 or the more exacting test described in *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705].

Per *Chapman v. California, supra*, 386 U.S. 18, if a trial court's instructional error violates the United States Constitution, then to avoid reversal, the People must " 'prove beyond a reasonable doubt that the error . . . did not contribute to the verdict obtained.' [Citation.]" (*People v. Mower* (2002) 28 Cal.4th 457, 484.)  But if a trial court's instructional error violates only California law, then under *People v. Watson, supra*, 46 Cal.2d 818, the decision will be affirmed unless " 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' [Citation.]" (*Mower*, at p. 484.)

Even assuming the more rigorous *Chapman* test applies here, we conclude any error in the trial court's instructions related to the license defense was harmless beyond a reasonable doubt.  Defendant argued, at the trial court, that his concealed carry license allowed him to carry the Derringer handgun that he possessed at the time of his arrest. But because defendant's license did not even cover the Derringer handgun, the alleged defense fails as a matter of law.  As discussed above in part I of the Discussion, a concealed carry license only covers those particular firearms listed in the license.  And as the record shows, defendant's license, even before it was suspended, only allowed him to carry two particular weapons:  a .380-caliber Beretta handgun and a .45-caliber Sig handgun.  It did not list the Derringer handgun that defendant carried at the time of his arrest.  Defendant thus lacked any potentially meritorious defense that his license

7

authorized him to carry the Derringer handgun.  As a result, any error in the instructions about the license defense was harmless beyond a reasonable doubt.

III

*Admission of the Nevada County Sheriff's Office's License Report*

Defendant next argues the trial court violated both hearsay rules and the confrontation clause in admitting into evidence the Nevada County Sheriff's Office's concealed weapon license report.  Neither claim has merit.

A.  *Hearsay Claims*

Hearsay statements—out-of-court statements offered to prove the truth of the matter asserted—are generally inadmissible under Evidence Code section 1253.  But there are several exceptions to this general prohibition.  Evidence Code section 1271 provides one exception for writings recording an act, condition, or event when (1) the "writing was made in the regular course of a business," (2) the "writing was made at or near the time of the act, condition, or event," (3) the "custodian or other qualified witness testifies to its identity and the mode of its preparation," and (4) the "sources of information and method and time of preparation were such as to indicate its trustworthiness."  Evidence Code section 1280 provides a similar exception for writings recording an act, condition, or event when (1) the "writing was made by and within the scope of duty of a public employee," (2) the "writing was made at or near the time of the act, condition, or event," and (3) the "sources of information and method and time of preparation were such as to indicate its trustworthiness."

"A trial court has broad discretion in determining whether a party has established the[] foundational requirements" of a hearsay exception.  (*People v. Martinez* (2000) 22 Cal.4th 106, 120.)  "A reviewing court may overturn the trial court's exercise of discretion ' "only upon a clear showing of abuse." ' [Citations.]" (*Ibid.*)

Defendant contends the trial court committed such an abuse of discretion for several reasons.

8

First, he argues, because the Nevada County Sheriff's Office witness who testified, Candy Poulter, did not herself make the license report, the report was not admissible under Evidence Code section 1271. But Evidence Code section 1271 does not require the particular person who prepared the writing to testify. It requires a "custodian or other qualified witness," and a qualified witness "need not be . . . the person who created the record." (*Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 322-324.) Although Poulter did not input all the license report entries, the trial court was well within its discretion in finding her a qualified witness to provide the foundational basis for the report. Poulter testified that she was the records supervisor at the Nevada County Sheriff's Office, she had been in the position for about 18 months, and her department held all the office's records involving concealed carry licenses. Her testimony also demonstrated that she was familiar with the concealed carry license reports, was familiar with how these reports were made, and had herself input entries into license reports. The trial court did not abuse its discretion in finding Poulter a qualified witness on these facts.

Second, defendant contends Poulter's testimony failed to show the license report exhibited the requisite trustworthiness. Although defendant's trial counsel argued the report was untrustworthy for several reasons, on appeal, defendant relies on a single discrepancy to make this argument: the report did not show whether the Department of Justice had been informed of the suspension of defendant's license in July of 2012, even though the sheriff's office was legally required to notify the Department of Justice about the suspension. (See § 26225, subd. (b).) But this detail does nothing to show the report lacked trustworthiness. It simply reflects an apparent fact—the Nevada County Sheriff's Office, although required to notify the Department of Justice about the July 2012 suspension, apparently neglected to do so. Indeed, a Department of Justice witness testified that, at the time of defendant's arrest in April of 2013, the Department of Justice had no records showing that defendant's license had been suspended—something it would have had if the sheriff's office had actually reported the suspension. (See § 11106,

9

subd. (a)(1)(C).) It instead only had a copy of defendant's license. In any event, to the extent defendant has shown an omission in the license report, it is not one that warrants finding an abuse of discretion. Although the court was required to find the report sufficiently trustworthy, it was not required to find the report flawless. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1011 ["that a business record contains some omissions does not necessarily render unreliable the information the record includes"].)

Finally, as to hearsay, defendant argues the trial court employed the wrong test in evaluating whether the report was sufficiently trustworthy. According to defendant, the court found questions about the report's trustworthiness went to its weight rather than its admissibility. But that is not a fair characterization. The court instead noted that arguments about mistakes in the report (e.g., that inputted data was out of order) would go to weight rather than admissibility, and it did not err in saying as much. Although true that a showing of trustworthiness is a prerequisite to admitting records under Evidence Code section 1271 and 1280, questions about mistakes in data entry go to weight, not admissibility. (See *People v. Martinez* (2000) 22 Cal.4th 106, 132; see also *United States v. Catabran* (9th Cir. 1988) 836 F.2d 453, 458 [questions "as to the accuracy of [computer] printouts, whether resulting from incorrect data entry or the operation of the computer program, as with inaccuracies in any other type of business records, . . . [affect] only the weight of the printouts, not their admissibility"].)[2]

---

**2**    In his reply brief, defendant raises several new arguments as to why the license report was inadmissible hearsay. He claims the report was not made in the regular course of public employment but rather was prepared by the sheriff's secretary for purposes of litigation. He claims the report entries were not made contemporaneously. And he claims Poulter was not the custodian of the license report. Although defendant did allege some of the facts underlying these arguments in his opening brief, he made none of these legal arguments. Because defendant raises these arguments for the first time in his reply brief, without good cause, we will not consider them. (See *Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8.)

B. *Confrontation Clause Claims*

The confrontation clause comes from the Sixth Amendment, which provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." (U.S. Const., 6th Amend.) It applies to both federal and state prosecutions, and generally bars admission of "testimonial" hearsay against a defendant "unless (1) the declarant is unavailable to testify and (2) the defendant had a previous opportunity to cross-examine the witness or forfeited the right by his own wrongdoing." (*People v. Sanchez* (2016) 63 Cal.4th 665, 680.) In determining whether a statement is "testimonial" within the meaning of the confrontation clause, "the question is whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.' [Citation.]" (*Ohio v. Clark* (2015) 576 U.S. 237, 245 [192 L.Ed.2d 306].)

According to defendant, the trial court violated the confrontation clause by failing to produce the witnesses who input the data into the license report. But defendant fails to show that the license report included any statements that were "testimonial" in nature. His opening brief claims the license report includes testimonial statements in violation of the confrontation clause, but never clearly explains why. His reply brief is a little better. Although there he claims the report was prepared for litigation, he offers no record citations to support the claim.

We find defendant's claims unsupported. As Poulter testified, the Nevada County Sheriff's Office staff enter notes in the license reports to track events relating to licenses and license applications. Preparation of these license reports thus reflects an effort to document the status of concealed carry licenses and applications, not to " 'creat[e] an out-of-court substitute for trial testimony.' " (*Ohio v. Clark*, *supra*, 576 U.S. at pp. 244-245.) Although license reports may at times become relevant evidence in a criminal trial, that fact is not enough. Because defendant has not shown these reports to be prepared for the

11

"primary purpose" of being offered at trial, his argument under the confrontation clause fails.**3**

IV

*Admission of Candy Poulter's Testimony*

Defendant next contends the trial court should have stricken Candy Poulter's testimony because she relied on handwritten notes that were not provided to the defense in violation of Evidence Code section 771. Because his current argument under Evidence Code section 771 was not raised at trial, however, we find it to be forfeited on appeal.

Evidence Code section 771, subdivision (a) provides—subject to one exception not relevant here—that "if a witness, either while testifying or prior thereto, uses a writing to refresh his memory with respect to any matter about which he testifies, such writing must be produced at the hearing at the request of an adverse party and, unless the writing is so produced, the testimony of the witness concerning such matter shall be stricken."

Defendant raises this provision on appeal with respect to certain handwritten notes that Poulter had brought to the witness stand. Poulter testified she had received a copy of the prosecutor's questions in advance of testifying and had handwritten notes about how to respond because she was "very nervous" about testifying. She at one point mentioned she had these notes with her at the witness stand, and in response, the court said, "[l]et's let the lawyer take a look at it." According to the transcript, defense counsel then

---

**3**    Defendant also claims, in his argument about the license report, that Poulter was not qualified to render an opinion as to whether defendant had a valid concealed carry license on the date of his arrest. But defendant offers only this bare conclusion without explaining why this is so. Defendant also raises this argument in a section that, according to its heading, is about the wrongful admission of the license report, not the admissibility of Poulter's testimony. Because of these shortcomings, the argument is forfeited. (See Cal. Rules of Court, rule 8.204(a)(1)(B); *Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830, fn. 4.)

12

"view[ed] the witness's document." Defense counsel later asked Poulter whether she reviewed the notes during questioning, but Poulter said she had not.

During a later break in testimony, defense counsel argued he was entitled to copies of Poulter's notes, but not because she had reviewed them to refresh her memory. Although he did ask Poulter whether she had reviewed her notes during her testimony, after she answered she had not, he did not raise that particular issue further. He instead phrased his right to see the notes as a general discovery issue. Under the criminal discovery statute, Penal Code section 1054.1, a prosecutor must disclose, if in her possession or if she knows it is in the possession of the investigating agencies, all "relevant real evidence seized or obtained as a part of the investigation," any exculpatory evidence, and various other materials and information. (See also *Brady v. Maryland* (1963) 373 U.S. 83, 87-88 [10 L.Ed.2d 215].) Along these lines, defense counsel at trial argued that when a testifying law enforcement officer has notes, the defense has a right to see those notes. He later added he had a right to see Poulter's notes because "I don't know whether or not [the notes] contain new information. . . ."

Based on this argument, the court ultimately agreed that the prosecution, under its discovery obligations, would be required to disclose the notes if they contained any new substantive information. The prosecutor responded this was not quite true because she did not have copies of Poulter's notes and did not even know of the notes until Poulter testified. But she nonetheless agreed to review the notes and after doing so, informed the court and defense counsel that they included no new information. Defense counsel did not pursue the issue further.

Now on appeal, defendant attempts to resuscitate the issue with a new argument, claiming the trial court violated Evidence Code section 771 by refusing defense counsel access to Poulter's notes that she used to refresh her recollection. Defendant's argument fails in several respects. First, the record belies defendant's claim that his counsel was refused access to Poulter's notes. As the record reflects, the court offered defense

13

counsel an opportunity to "take a look" at the notes, and in response, defense counsel "view[ed] the witness's document." More importantly, however, defendant cannot object on one basis at the trial level, waive that objection at trial, and then raise a new objection on appeal that the parties below never had the opportunity to address. " 'As a general rule, theories not raised in the trial court cannot be asserted for the first time on appeal.' " (*Nellie Gail Ranch Owners Assn. v. McMullin* (2016) 4 Cal.App.5th 982, 997.) That is particularly true when the issue has already been forfeited. Although at trial defense counsel originally expressed concern that Poulter's notes may contain discoverable new substantive information, when the prosecution said they did not, defense counsel declined to pursue the issue further. We thus find defendant's current argument under Evidence Code section 771 forfeited.

V

*California's Concealed Weapons Laws and the Second Amendment*

Finally, defendant mounts a facial challenge under the Second Amendment to California's licensing scheme for concealed firearms.

The Second Amendment, which has been found applicable to the states by virtue of the Fourteenth Amendment, provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." (U.S. Const., 2d Amend.; see also *McDonald v. City of Chicago* (2010) 561 U.S. 742, 791 [177 L.Ed.2d 894] [the Second Amendment applies to the states].) According to defendant, California's licensing laws for concealed firearms unconstitutionally burden the Second Amendment right to bear arms without an adequate justification, though he offers no facts to support the claim.

Other defendants have raised similar challenges to California's licensing laws for concealed firearms—all without success. In *People v. Yarbrough* (2008) 169 Cal.App.4th 303 (*Yarbrough*), for example, the court found state laws restricting the right to carry concealed firearms do not implicate the Second Amendment. (*Id.* at p. 314.)

14

More recently, the Ninth Circuit in *Peruta v. County of San Diego* (9th Cir. 2016) 824 F.3d 919, sitting en banc and also considering California's concealed carry laws, found the same: "[T]he Second Amendment—whatever the scope of that protection may be— simply does not extend to the carrying of concealed firearms in public by members of the general public." (*Id.* at p. 927.)

Both courts, in reaching their decisions, relied heavily on the Supreme Court's "watershed case interpreting the Amendment": *District of Columbia v. Heller* (2008) 554 U.S. 570 [171 L.Ed.2d 637] (*Heller*). (*Peruta*, *supra*, 824 F.3d at p. 927.) In *Heller*, the court found the District of Columbia's "ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." (*Heller*, at p. 635.) But the court was careful to limit its holding in contexts outside the home. Most importantly, the court wrote that "[l]ike most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. [Citations.] For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues. [Citations.]" (*Id.* at p. 626.)

Relying in large part on this discussion, the court in *Yarbrough* found "the prohibition 'on the carrying of a concealed weapon without a permit, continues to be a lawful exercise by the state of its regulatory authority notwithstanding the Second Amendment.' [Citation.]" (*Yarbrough*, *supra*, 169 Cal.App.4th at p. 314.)

The court in *Peruta* agreed, but first expanded on the *Heller* court's historical analysis of past laws regulating the carrying of concealed weapons. Because the *Heller* court found the Second Amendment "codified a right 'inherited from our English ancestors' " (*Heller*, *supra*, 554 U.S. at p. 599), the *Peruta* court began with a discussion

15

of the historic right to bear arms in England.  This history, the court found, demonstrated that carrying a concealed firearm in public was historically not allowed in England. (*Peruta*, *supra*, 824 F.3d at p. 932.)  The court noted, for example, a 1541 English statute that prohibited "carrying concealable (not merely concealed) weapons, such as 'little shorte handguns and little hagbutts,' and guns 'not of the lengthe of one whole Yarde or hagbutt or demyhake beinge not of the lenghe of thre quarters of a Yarde.'  [Citations.]" (*Id.* at pp. 930-931.)  The court also noted similar later prohibitions against the carrying of concealed weapons in the sixteenth, seventeenth, and eighteenth centuries.  (*Id.* at pp. 931-932.)  In sum, the court found, "by the end of the eighteenth century, when our Second Amendment was adopted, English law had for centuries consistently prohibited carrying concealed (and occasionally the even broader category of concealable) arms in public." (*Id.* at p. 932.)

The court next considered the right to carry concealed weapons in the American colonies and in the early states.  Reviewing the historical record on concealed weapons in the American colonies, the court found nothing there that differed significantly from the law in England.  (*Peruta*, *supra*, 824 F.3d at p. 933.)  Finally, reviewing state law around the time of the adoption of the Fourteenth Amendment, the court found that there too the consensus of state laws and state courts did not stray from England's historical prohibition on concealed weapons.  (*Id.* at pp. 933-939.)  State courts in this time period that considered laws forbidding concealed firearms, for example, all found the laws consistent with the Second Amendment and their state Constitutions, with only one short-lived exception.  (*Id.* at p. 939.)  That one exception was a Kentucky court, which found a law prohibiting concealed weapons violated the state's Constitution.  (*Id.* at p. 935.)  Shortly after the decision, however, Kentucky amended its Constitution to clarify that the state could pass laws forbidding the carrying of concealed weapons.  (*Id.* at pp. 935-936.)  Finally, and perhaps most important of the cases in this time period, the United States Supreme Court in *Robertson v. Baldwin* (1897) 165 U.S. 275 [41 L.Ed. 715]

16

acknowledged, although in dicta, that "the right of the people to keep and bear arms (art. 2) is not infringed by laws prohibiting the carrying of concealed weapons." (*Id.* at pp. 281-282.)

In light of this history, the court in *Peruta* found "the Second Amendment right to keep and bear arms does not include, in any degree, the right of a member of the general public to carry concealed firearms in public." (*Peruta*, *supra*, 824 F.3d at p. 939.)

We find the *Peruta* court's analysis persuasive. As the court in *Heller* found, the Second Amendment "codified a right 'inherited from our English ancestors' " (*Heller*, *supra*, 554 U.S. at p. 599), and our English ancestors historically had no right to carry concealed weapons. Consistent with this English history, courts in the early states—with one short-lived exception—agreed that members of the general public could be prohibited from carrying concealed weapons consistent with the Second Amendment and state Constitutions. Given this history, we find that defendant has no constitutional right to carry a concealed weapon under the Second Amendment.[4]

---

[4] In one California case, *People v. Ellison* (2011) 196 Cal.App.4th 1342, the court assumed that a state law prohibiting the carrying of a concealable firearm in a vehicle was within the scope of the Second Amendment and opted to review the law under the " 'intermediate scrutiny' " standard. (*Id.* at p. 1347.) Applying this standard, the court found the prohibition constitutional because it "d[id] not substantially burden defendant's exercise of his Second Amendment right." (*Id.* at p. 1351.) We, however, are persuaded that the laws here fall outside the reach of the Second Amendment, and thus we need not evaluate whether they pass intermediate or heightened scrutiny.

## DISPOSITION

The judgment is affirmed.

      /s/            
BLEASE, Acting P. J.

We concur:

      /s/            
DUARTE, J.

      /s/            
RENNER, J.